FILED

APR 28 2006

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| EUGENE P. KENT, | * | CIV 02-4214 |
| | * | **2006 D.S.D. 7** |
| Plaintiff, | * | |
| -vs- | * | MEMORANDUM OPINION |
| | * | AND ORDER |
| UNITED OF OMAHA LIFE INSURANCE COMPANY, a Nebraska corporation with its principal office at Mutual of Omaha Plaza, Nebraska, | * | |
| Defendant. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**KORNMANN, U.S. DISTRICT JUDGE**

### PROCEDURAL HISTORY

[¶1] On September 26, 2002, Eugene P. Kent ("Kent") filed this diversity action against the United Of Omaha Life Insurance Company ("Omaha"), alleging fraud and deceit, breach of fiduciary duty, and unfair trade practices, all under South Dakota law. On February 6, 2003, Omaha, pursuant to Fed. R. Civ. P. 56, filed a motion for summary judgment (Doc. 13), arguing that the legal doctrines of res judicata and collateral estoppel, *in pari delicto*, and various other public policy considerations barred all of Kent's claims. The Court denied that motion on June 6, 2003 (Doc. 31). On October 31, 2003, Omaha filed a second motion for summary judgment (Doc. 35), claiming, *inter alia*, that it generally owed Kent no duty, that it had no duty to disclose matters of law or matters protected by the attorney-client privilege, that Kent's claims were barred by the statute of limitations and a release that Kent signed, and that Kent had no cause of action for alleged unfair trade practices. This motion was denied, except as to Kent's unfair trade practices claim, which claim was dismissed (Doc. 70).

[¶2] A jury trial was held August 29, 2005, through September 7, 2005. The jury returned its verdict on September 7, 2005, finding that Omaha was liable for damages for committing deceit toward Kent and for breaching a fiduciary duty it owed Kent. The damages awarded to Kent

included $500,000 for his claimed loss of income prior to the verdict, while he was incarcerated, $1,500,000 for Kent's claimed loss of income prior to the verdict, excluding any loss of income while he was in prison, $900,000 for Kent's claimed loss of future income, $7,000,000 for Kent's loss of liberty because of Omaha's refusal to produce shipping documents without a subpoena, $10,000,000 for punitive damages in connection with Kent's loss of liberty, and $7,500,000 for punitive damages in connection with Kent's loss of insurance license and loss of income. In addition to these amounts, prior to the submission of the case to the jury, the parties stipulated to a prejudgment interest formula as to any damages for Kent's loss of income prior to verdict. A judgment to this effect was filed on September 16, 2005 (Doc. 124).

[¶3]  Omaha has timely filed various motions for post-trial relief. First, it filed a motion to stay the enforcement of the judgment (Doc. 125). The Court granted this motion (Doc. 141). It also filed a renewed motion for judgment as a matter of law, a motion for new trial, and a motion for remittitur (Doc. 129).[1]

## JUDGMENT AS A MATTER OF LAW

[¶4]  Fed. R. Civ. P. 50(b) provides that "[i]f, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Judgment as a matter of law under Fed. R. Civ. P. 50 is proper "only when there is a complete absence of probative facts to support the conclusion reached" by the jury. Hathaway v. Runyon, 132 F.3d 1214, 1220 (8th Cir. 1997). In considering a Rule 50 motion, the court is to view the evidence in the light most favorable to the verdict. Denesha v. Farmers Ins. Co., 161 F.3d 491, 496 (8th Cir. 1998). The prevailing party is to receive the benefit of all reasonable inferences. Ryther v. KARE 11, 108 F.3d 832, 844 (8th Cir. 1997) (en banc). In addition, the court is to assume that all conflicts in the evidence were resolved in favor of the prevailing party and assume that the prevailing party proved all the facts that the prevailing party's evidence tended to prove. Id. To succeed on such a motion, the defendant must

---

[1] Omaha first asks the Court to grant its motion for judgment as a matter of law. The other motions are submitted in the alternative in the event that its motion for judgment as a matter of law is not granted.

demonstrate that no reasonable juror could have found for the plaintiff. Curtis v. Electronics & Space Corp., 113 F.3d 1498, 1502 (8th Cir. 1997). A trial court may not usurp the jury's function by re-weighing the evidence or the credibility of witnesses. McGee v.South Pemiscot School Dist. R-V, 712 F2d 339, 344 (8th Cir. 1983). A judge must be "reluctant to set aside a jury's verdict and will not do so lightly." Kelly v. Armstrong, 206 F.3d 794, 797 (8th Cir. 2000).

## I. Shipping Documents Claim

[¶5]   Omaha argues first that the Court erred in submitting Kent's "shipping documents" claim to the jury because, as a matter of law, Omaha had no duty – fiduciary or otherwise – to produce documents voluntarily without a subpoena five years after the agency relationship between Omaha and Kent ended.[2] Omaha argues that there is no statute, case, or common law principle that created a duty upon Omaha to produce the shipping documents voluntarily without a subpoena. Accordingly, at a very minimum, Omaha claims it is entitled to judgment as a matter of law on Kent's loss of liberty claim and vacatur as to damage items 1, 4 and 5 of the jury's verdict.

[¶6]   On January 11, 1996, Kent was indicted by a federal grand jury on sixty-one counts. These counts were related to his operation of the self-insured Independent Community Banker's Association ("ICB") group health plan during 1991. Among these counts were two counts of mail fraud, in which it was alleged that Kent had received, through the U.S. Mail, a $150,000 check sent by Omaha on January 24, 1991, and a $183,910 check sent by Omaha on May 13, 1991.[3] Kent was convicted by a jury of these two counts on October 25, 1996. Kent's lawyer, a

---

[2] In Doc. 129, Omaha reasserts each and every argument it has ever made in this case in support of its post-trial motions. Nearly all of these issues were litigated, briefed, and argued at length before trial ever got underway. Other than what is expressly set forth herein, the Court relies on its prior rulings as to those arguments.

[3] The question of whether the U.S. mail was used was significant at the time of Kent's prosecution because the federal criminal statute under which he was charged, 18 U.S.C. § 1341, was only applicable as to materials carried by the U.S. Postal Service. This statute was amended in 1994 to broaden its application to cover "any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier." Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 250006 (codified as amended at 18 U.S.C. § 1341).

non-resident of South Dakota, failed to raise the issue of whether, in fact, the U.S. Mail was used to send the checks.

[¶7] The testimony at this trial showed that, as Kent stood convicted, he realized there was evidence that these checks were not sent through the U.S. Mail, but through the United Parcel Service ("UPS").[4] He hired another attorney, Jim Volling ("Volling"), a Minnesota attorney, who attempted to get the shipping documents from the Omaha office in Minnesota. Omaha executives, Dick Norberg ("Norberg") and Steve Fisher ("Fisher"), refused to turn over the shipping documents requested without being served with a subpoena. Volling's attempts at obtaining a subpoena and retrieving the shipping documents were rebuffed, as explained below. Without the exonerating information at his disposal, Kent proceeded to be sentenced to 24 months. After serving his sentence and filing a motion for relief pursuant to 28 U.S.C. § 2255, Kent was able to obtain a subpoena and retrieve both shipping documents. His conviction was vacated by U.S. District Judge John Jones on the basis that Kent's original criminal lawyer failed to adequately defend Kent by not looking into the question regarding the method of transmission of the checks before or during the criminal trial and not requiring the government to prove that the U.S. Mail was used.

[¶8] One of Kent's claims at this civil trial was that Omaha knew, and had documents in its possession which verified, that neither of these checks had been sent by the U.S. Mail but refused to voluntarily turn over these documents. The question with which this Court has wrestled is whether, as a matter of law, Omaha did anything unlawful by requiring that the documents be subpoenaed. There is no question that exculpatory evidence in the possession of third parties is subject to a subpoena duces tecum. *See e.g.* United States v. Cuthbertson, 651 F.2d 189, 195 (3rd Cir.), *cert denied*, 454 U.S. 1056 (1981). "A subpoena duces tecum is the vehicle for securing production of documents and things at a specified time and place either before or after the time of trial." United States v. Beckford, 964 F.Supp. 1010, 1017 (E.D. Va. 1997). Documents may be produced at court proceedings other than trials. 2 Wright, Federal Practice and Procedure: Criminal 2d § 271 at 134 ("[Rule 17] is not limited to subpoena for the trial. A

---

[4] The testimony revealed that Kent had documentary evidence that the $183,910 check was sent by UPS, but lacked information as to the $150,000 check.

subpoena may be issued for a preliminary examination, a grand jury investigation, a deposition, for determination of an issue of fact raised by a pretrial motion, or for posttrial motions."). *See also* United States v. Winner, 641 F.2d 825 (10th Cir. 1981) ("Although Rule 17 subpoenas are generally employed in advance of trial, we see no reason why their use should not be available for post-trial motions and sentencing.").

[¶9]   The crux of Kent's claim centers around Omaha's refusal to turn over the documents after he was convicted but before he was sentenced. It was at this time that Kent hired Volling, who filed a motion for new trial based upon newly discovered evidence (Doc. 77 in CR 96-40002). A party is generally not provided with an evidentiary hearing in connection with a motion for new trial. The civil trial testimony revealed that Volling requested that Judge Jones conduct a hearing as to the shipping documents issue and sought the court's permission to serve a subpoena on Omaha, requiring that it produce the shipping documents and that its Minnesota officials appear in Sioux Falls and give testimony at a hearing. I have wondered for some time why Mr. Volling, an attorney with an excellent reputation and from a prestigious national law firm, did not simply obtain two subpoenas duces tecum from the clerk of courts (as permitted by Fed.R.Crim.P. 17(a)) and cause service to be made on the Minneapolis officials. The rule itself seems to be clear in authorizing that. We know also that Fed.R.Crim.P. 17(e) permits service of a subpoena in connection with a "hearing" to be made at any place within the United States and the Minnesota witnesses could have been required to appear in Sioux Falls. The witnesses and the documents would then have been there for the sentence hearing. The witnesses would have been called to testify with the shipping documents and there would have been no doubt that Mr. Kent had been wrongfully convicted. Without the witnesses and the documents being there, Judge Jones was left in doubt and did not wish to postpone the sentence hearing.

[¶10]  Under South Dakota practices, there was absolutely no reason to involve Judge Jones since Mr. Kent was not indigent. I have never heard of a non-indigent defendant in South Dakota involving the court at all as to subpoenas. I doubt that Judge Jones had either. Not even the Federal Public Defender's office involves the court in issuing and serving subpoenas. Subpoenas are none of the judge's concern and any practice of asking the judge to approve in advance the issuance of a subpoena (the expense of which is paid for by a private party) has never been the

practice in the District of South Dakota. *See also* United States v. Van Allen, 28 F.R.D. 329 (S.D.N.Y. 1961) ("Permission of the court is not needed to serve a subpoena pursuant to Rule 17(c) . . ."); 2 Wright, Federal Practice and Procedure: Criminal 2d § 274 at 154. Having said all this, I believe I now understand why Mr. Volling acted as he did. He would not be familiar with the informal practices in the District of South Dakota. He would be very familiar with what is required in the District of Minnesota. Minnesota, like the Western District of New York (and other districts), insists on court supervision and approval in advance as to subpoenas in criminal cases. *See* United States v. Finn, 919 F. Supp. 1305, 1329 (D.Minn. 1995). Mr. Kent made the decisions to utilize a non-resident attorney (although a member of the State Bar of South Dakota) for his criminal trial and then, after his convictions, an attorney from Minnesota who was not a member of the State Bar of South Dakota or familiar with the informal and unwritten practices here.

[¶11] In any event, Volling testified that Judge Jones denied Volling's request for an evidentiary hearing and refused to acquiesce in the service of a subpoena (Doc. 88 in CR 96-40002). The question then is whether Omaha can be held liable to Kent for refusing to voluntarily turn over the shipping documents, which Kent maintains Omaha knew to be exculpatory, without being first served with a subpoena duces tecum. Omaha cites various cases which stand for the proposition that one need not voluntarily be interviewed by defense counsel in a criminal case. *See e.g.* United States v. Bowens, 318 F.2d 828, 829 (7th Cir. 1963), United States v. Pinto, 755 F.2d 150, 152(10th Cir. 1985), United States v. Fischel, 686 F.2d 1082, 1092 (5th Cir. 1982), United States v. Agostino, 132 F.3d 1183, 1191 (7th Cir. 1997), and Byrnes v. United States, 327 F.2d 825, 831 (9th Cir. 1964). However, these cases do not squarely address the issue at hand, namely whether a former principal is required, as a matter of law, to turn over exculpatory evidence to a former agent. Neither party has cited case law directly on point on this question, presumably because there is none. Moreover, a corporation such as Omaha generally has the right to refuse to turn over documents unless a subpoena is served. Whether this is true in the instant case, taking into account Kent's arguments regarding SDCL 20-10-2(3), is another question.

[¶12] Kent obviously argues that his deceit claim, based upon Omaha's conduct in 1996 and 1997 with respect to the shipping documents, was properly placed before the jury. Questions of fraud and deceit generally are fact questions for the jury. Richland State Bank v. Household Credit Services, Inc., 340 F.Supp.2d 1051 (D.S.D. 2004), and Sporleder v. Van Liere, 1997 SD 110 ¶13, 569 NW2d 8, 11. Specifically, Kent points to the second clause of SDCL 20-10-2(3), which states that deceit includes "[t]he suppression of a fact by one . . . who gives information of other facts which are likely to mislead for want of communication of that fact." Kent cites Dick Norberg's testimony in response to questioning by the prosecutor at Kent's criminal trial in support of this theory:

> Q: Sir, just one more thing I want to go over with you. Do you have Exhibits 40 and 41, or are they still up here? Sir, I'll ask you to look at Numbers 40 and 41 again, if you would. Does 41 reflect that 150,000 dollar check, Exhibit Number 41 being mailed? Does Exhibit 40 reflect that, sir?
> A: That it has been mailed?
> Q: Yes, in Exhibit 40, sir.
> A: Oh, yes. Excuse me.
> Q: What was the date of mailing that document?
> A: From me to Gene Kent?
> Q: Right.
> A: January 24th, 1991.

United States v. Kent, CR 96-40002, Trial Transcript, pages 348-49 (emphasis supplied).

[¶13] The compound, confusing, and leading question above was clearly objectionable, especially in a case of alleged mail fraud. The question and answer finally boiled down to exhibit 40 only. There was no testimony as to exhibit 41. What was Kent's criminal trial lawyer thinking about while this was happening?

[¶14] Kent's theory is that Omaha, through Norberg's testimony at his criminal trial, gave information of certain facts likely to mislead, namely that the checks were sent via the U.S. Mail. Kent claims that, by giving information likely to mislead, Omaha created an obligation under SDCL 20-10-2(3) to "come clean," or, in other words, to disclose the fact that the shipments were made by UPS. Kent claims that Omaha's failure to disclose the shipping method is what creates liability for deceit in this case. Further, Kent asserts that SDCL 20-10-2(3) does not authorize one who has given misleading information to suppress facts unless provided with a subpoena.

7

[¶15]   While this is a novel and imaginative theory, it is not without problems. Kent seems to point his finger exclusively at Omaha. The testimony at trial and the history of this case (as I have already discussed in part) demonstrates that responsibility for the failure to obtain the shipping documents cannot rest solely or even largely on the shoulders of Omaha. There were other factors at play that bear mentioning. First, it is undisputed that Kent's criminal trial lawyer failed to investigate how the checks were sent. He failed to hold the government to its burden of proof on this element of the two mail fraud offenses. In fact, the only direct testimony at the criminal trial with respect to "mailing" was Norberg's responses to Assistant U.S. Attorney Robert Mandel's ("Mandel") leading and confusing questions, as laid out above. Even these questions did not delve so deeply as to expose, specifically, whether U.S. Mail or a private carrier was used. Rather, Mandel's questions generically referenced "mail," which, in common usage, could mean it was sent in any variety of ways. Norberg's testimony did not suggest any appreciation of the legal significance of the method of shipment.

[¶16]   Second, it goes without saying that Bonnie Efland ("Efland"), Kent's then office manager, would have physically received the two checks at Kent's office. They were delivered to that location and were put to use by Kent and his office. Thus, it could be inferred that Kent or Efland or both were on notice as to how the checks were sent at the time of receipt.

[¶17]   Third, Omaha was not the only party unwilling to assist Kent. The U.S. Attorney's office refused to stipulate with Volling that the issuance of a subpoena duces tecum was appropriate. As previously described, there was no need to even seek such a stipulation. Prior to the sentence hearing, Judge Jones refused to allow for an evidentiary hearing or the service of a subpoena in connection with a motion for new trial. I repeat the earlier statement that Judge Jones should not have been involved in any subpoena matters unless a witness was attempting to quash or modify the command of the subpoenas. While Omaha's reluctance to voluntarily turn over the documents may have been the catalyst for Kent's need for a subpoena, as a point of fact, others shared responsibility for the injustice that Kent suffered.

[¶18]   Omaha points to SDCL 20-10-1, which provides, "[o]ne who *willfully deceives* another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers (emphasis added)." The Court is more than leery of Kent's attempt to impose

liability based solely on Norberg's testimony at Kent's criminal trial. It is important to remember that apparently no one was thinking about the transmission issue at the time of Kent's trial. It was after the trial, but before sentencing, when the issue finally surfaced. There is no evidence that Norberg had any intent to deceive or any knowledge about the actual transmission method of the checks at the time he testified in Kent's criminal trial. It is not as though he was conspiring with others to obtain a conviction by falsely testifying that the U.S. Mail was used. Norberg was merely responding to the leading questions posed by the prosecutor, namely whether one check was "mailed." There was no evidence at all about the other check being "mailed." In the view of most people not trained in federal criminal law, to "mail" means to send by a courier, whether that courier be the U.S. Postal Service, UPS, Federal Express, DHL, or some other private courier. It cannot be said with any certainty what was going through Norberg's mind when he testified. There is, however, no evidence that he was willfully attempting to put false information in front of the jury. After the trial, as the more precise issue with respect to the shipping methods surfaced, Kent came to realize that the checks were shipped by UPS. From the time he stood convicted until the time he was sentenced, neither Norberg nor anyone else employed by Omaha made any representation to confirm or deny the shipping method. Omaha freely admitted it had the documents and told Volling how to get them - with a subpoena.

[¶19]   The problem with Kent's claim is that he attempts to impose liability based on actions of Omaha that were not carried out in an attempt to willfully deceive Kent. At most, Omaha's actions can be summarized as a careless statement regarding the use of "mail" by one of its agents and a refusal to voluntary acquiesce with Kent's requests for documents. The Court of Appeals for the First Circuit considered a case that, although factually and legally distinguishable, is worthy of discussion. In Bolduc v. United States, 402 F.3d 50 (1st Cir. 2005), the plaintiffs spent more than eight years in prison as the result of an FBI agent's negligent failure to provide federal prosecutors with exculpatory evidence. A federal grand jury in Milwaukee indicted plaintiffs for their alleged involvement in two armed robberies, based largely on eyewitness identifications. Eventually, the plaintiffs proceeded to trial. The prosecution relied entirely upon eyewitness identifications, including the testimony of three witnesses who had previously identified other individuals as "similar" or "identical" to the robbers. Neither the

prosecutor nor the witnesses mentioned the inconsistent matchups. The plaintiffs were found guilty of all charges. In time, the real culprits admitted to the crimes for which the plaintiffs were serving time. The plaintiffs filed federal habeas petitions, which the government did not oppose. The convictions were vacated and the plaintiffs commenced a civil action in the United States District Court for the District of Massachusetts, alleging, *inter alia,* that the FBI's negligent failure to disclose FBI 302 reports dealing with the identifications deprived them of the benefit of exculpatory evidence before and during the criminal trial, and thus led to their wrongful convictions.

[¶20]   The Court of Appeals noted that, since the action was filed under the Federal Tort Claims Act, the proper inquiry was whether "Wisconsin might impose tort liability upon a private party under circumstances sufficiently similar to those present in this case, that is, a person who comes into possession of exculpatory evidence as part of an official investigation and carelessly fails to disclose that evidence to prosecutors (and, ultimately, to the accused)." *Id.* at 57. The Court of Appeals ultimately found that the FTCA does not waive the federal government's sovereign immunity vis-a-vis the plaintiffs' negligence claim:

> Assuming arguendo that the appellants could demonstrate negligence, causation, and actual harm-a matter on which we take no view-Wisconsin law nonetheless would preclude the imposition of private liability on a private person in circumstances similar to those of Agent Craft. Under [*Bromund v. Holt,* 24 Wis.2d 336, 129 N.W.2d 149 (1964)], malice is a prerequisite for imposing private tort liability upon a private individual working with law enforcement when the performance of his duties has resulted in an unjustifiable criminal prosecution and/or conviction. *See id.* at 153-54. Because the appellants have failed to offer a scintilla of proof of malice, they have failed to establish a basis under the law of the place for imposing liability upon a private person in like circumstances.

*Id.* at 59.

[¶21]   Recognizing that Bolduc is not binding precedent and applies Wisconsin law, it serves to illustrate an appropriate consideration in the instant case. There is no doubt that Norberg's testimony was careless, but to say that it was malicious, or, more appropriately, a willful attempt to deceive, is quite another thing. Norberg did not intentionally testify in order to induce Kent to alter his position to his injury or risk; he was merely responding to seemingly innocuous leading questions. Moreover, Bolduc involved a federal agent's negligent failure to turn over

10

exculpatory evidence. The instant case involves the careless statement of a private individual testifying under subpoena from the government. Pragmatically speaking, should Norberg or any other agent of Omaha be held to a higher standard than federal law enforcement agents? It would seem not. Norberg and Omaha can possibly be criticized for their refusal to cooperate with Kent's defense absent being served with a subpoena. Their resistance to Kent's simple requests for shipping documents seems callous and petty. The more difficult question is whether this resistance can subject Omaha to liability under South Dakota law. Kent has attempted to characterize this behavior as "deceit" under SDCL 20-10-2(3). The Court rejects this contention. Taking into account the state of the law in South Dakota and the evidence in this case, Omaha was not legally bound to voluntarily turn over the shipping documents without first being served with a subpoena duces tecum. Any "special relationship" between Kent and Omaha had ended long before the criminal trial. The parties had been for some time legal adversaries. If there is an obligation under the law for a party to turn over non-privileged business records on request, there would be no need for Rule 17. As such, Kent's deceit claim as to Omaha's conduct in 1996 and 1997 that ultimately led to his conviction and imprisonment should be rejected. The damage amounts as to items 1, 4, and 5 of the jury's verdict should be vacated.

## II. Deceit and Breach of Fiduciary Duty Claims

[¶22]   Omaha argues that each of Kent's claimed instances of deceit are patently insufficient as a matter of law to support his claim that Omaha caused him to lose his insurance license. Omaha also claims that the evidence supports no breach of fiduciary duty claim. Omaha argues that Kent was aware of the potential problems with self-funded arrangements long before February of 1991. Omaha points to Kent's handwritten notes which show reference to §514, to multiple employer welfare associations, to self-funding reserving requirements, and to his understanding that he was a fiduciary. Omaha argues that Kent had the same information as was contained in the Harrington memo on this subject. Omaha also raises various other arguments concerning what Kent was or was not aware of throughout 1991 with respect to the ICB plan.

[¶23]   With the exception of Omaha's arguments with respect to the shipping documents, as previously discussed, Omaha essentially attacks the weight of the evidence as to Kent's deceit and breach of fiduciary duty claims. Unfortunately for Omaha, it is not the Court's role to weigh

11

the evidence, especially at this stage, unless there is a complete absence of probative facts to support the conclusion reached by the jury. This is not so.

[¶24]   The Court has previously addressed the statutory elements of the deceit claim, and determined that, with respect to Omaha's conduct in 1990 and 1991, judgment as a matter of law was not appropriate (Doc. 70). Deceit is defined to include, among other things, "[t]he suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact." SDCL 20-10-2(3). As to the fiduciary duty claim, the Court previously concluded that Kent was Omaha's agent in 1990 and 1991 and in a position where he placed trust in Omaha's superior knowledge. "A principal and an agent are in a fiduciary relationship." Shen v. Leo A. Daly Co., 222 F.3d 472, 477 (8th Cir. 2000). A confidential relationship imposes a duty to disclose. Buxcel v. First Fidelity Bank, 601 N.W.2d 593, 596-97, 1999 SD 126, ¶ 14. As such, Omaha was bound to inform Kent of risks of pecuniary loss to him. The jury found likewise, concluding that Omaha was liable to Kent for deceit and breach of fiduciary duty. The jury found that damages as to his loss of insurance license and consequent loss of income were appropriate.

[¶25]   Omaha quibbles with the evidence at trial, but the evidence was sufficient for the jury to find that Omaha suppressed important facts from Kent throughout 1991. Kent testified that he had no suspicions about legal problems with the self-funded plan throughout the fall of 1990, when he was told he could go ahead with a self-funded group plan for ICB. Kent testified that, had he known that the plan was possibly illegal, he would not have moved forward with it. He testified that he first learned of possible legal risks on February 7, 1991, when Omaha claimed that it just learned of the problem. Omaha told him that he may be violating South Dakota law and the Employee Retirement Income Security Act ("ERISA"), and the better course of action would be to switch the plan to a minimum premium plan ("MPP"). Kent also testified that, upon learning of these possible problems, he consulted with attorney Dick Cochrane ("Cochrane"), who told him not to proceed with a self-funded plan. Cochrane recommended that Kent get back on a fully insured plan. Kent then went to Norberg and told him that he wanted to switch to a MPP, a fully insured plan. Kent testified that there was no doubt that he wanted to go to a MPP and he had discussions with Norberg about keeping the same quotes in place as to the banks as

well as keeping the same benefits as under the previous fully insured plan. As of March 1, 1991, based on the representations of Norberg, Kent testified he thought he was back on a fully insured plan, much the same as what he was working with in 1990. Nonetheless, no new contracts, booklets, ID cards, or any other materials were sent to Kent. Kent did not learn that Omaha intended to keep the plan self-funded throughout 1991 until August 1991, even though Omaha made the decision in April to keep it self-funded. The evidence of suppression of the facts that Omaha knew of possible legal risks and that it intended to continue the plan as a self-funded plan throughout the balance of 1991 was sufficient for this claim to go to the jury.

[¶26] As previously discussed, the Court is to assume that all conflicts in the evidence were resolved in favor of the verdict and that the prevailing party proved all the facts his evidence tended to prove. Judgment as a matter of law is not appropriate as to Kent's remaining deceit claim or Kent's breach of fiduciary duty claim.

## NEW TRIAL

[¶27] Fed. R. Civ. P. 59(a) provides authority for granting a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." A motion for new trial pursuant to Fed. R. Civ. P. 59 should only be granted if "the jury's verdict [was] against the great weight of the evidence so as to constitute a miscarriage of justice." Denesha v. Farmers Ins. Exchange, 161 F.3d 491, 497 (8th Cir. 1998) (quoting Pulla v. Amoco Oil Co., 72 F.3d 648, 656 (8th Cir.1995)). Resolution of such a motion is committed to the sound discretion of the district court. Pulla, 72 F.3d at 656. "A new trial is appropriate when the first trial, through a verdict against the weight of the evidence, an excessive damage award, or legal errors at trial, resulted in a miscarriage of justice." Gray v. Bicknell, 86 F.3d 1472, 1480 (8th Cir. 1996), and Butler v. French, 83 F.3d 942, 944 (8th Cir. 1996).

[¶28] Omaha argues that it is entitled to a new trial because of the unfair prejudice that resulted when the jury was allowed to hear evidence regarding Kent's prosecution and imprisonment. Omaha claims that Kent strategically injected emotional evidence in an attempt to get the jury to award greater damages on an improper basis. As previously discussed, the Court will grant, in part, Omaha's motion for judgment as a matter of law as to the shipping documents claim and will vacate items 1, 4, and 5 of the jury's verdict, thus reducing the overall verdict by

$17,500,000. The exorbitant damage award about which Omaha complains will be significantly reduced. Thus, there are substantial doubts about the vitality of Omaha's argument in its motion for new trial since the remaining amounts are considerably different than those in place when the motion was filed.

[¶29] The verdict which remains for consideration by the Court includes $1,500,000 for Kent's loss of income prior to the verdict, excluding any loss of income while he was in prison, $900,000 for Kent's loss of future income, and $7,500,000 in punitive damages.

[¶30] To the extent that Omaha continues to ask for a new trial on the basis of the lost income figures, its motion for new trial should be denied. The amounts as to loss of income and loss of future income are supported by the evidence, and, in fact, represent lower amounts than what was introduced by Kent's expert witness. Dr. Ralph Brown ("Dr. Brown"), an economic professor employed by the University of South Dakota, relied on Kent's past income and various assumptions in arriving at figures representing Kent's past economic loss.[5] He testified that Kent's total past loss depended on whether he would have continued in the health insurance industry or would have gone back to selling other insurance products. Either way, Kent's past economic loss, including the time he was incarcerated, was estimated by Brown to be either $2,781,917, if he stayed in the health insurance field, or $2,623,215, if he left the health insurance field and sold other insurance products. The jury awarded $1,500,000 for Kent's loss of income while not incarcerated. The Court will vacate the amount the jury awarded ($500,000) for loss of income while incarcerated. The jury's verdicts as to Kent's loss of income, both while in prison and while out of prison, totaled $2,000,000. This figure is actually lower than what Brown suggested. Omaha's attempts to discredit the testimony of Dr. Brown at this stage are

---

[5] Dr. Brown used two computations to arrive at Kent's lost income. First, Dr. Brown used Kent's five year earnings average from 1990 to 1995, and adjusted it to 2005 dollars by using the Consumer Price Index (CPI) for those involved in the sale of health insurance, which is an industry where prices have risen significantly in the last 10 years. An increase in health insurance price translates to an increase in premiums for those who sell health insurance. Thus, Kent's lost income was higher under the assumption that he stayed in the health insurance field. Second, Dr. Brown did the same thing, assuming that Kent sold other types of insurance products. Under this assumption, the CPI was lower, thus resulting in a lower lost income figure.

misplaced. It is not the Court's role to second guess the jury on its acceptance or rejection of evidence at trial. Omaha had its chance to attack Dr. Brown's assumptions and figures at trial. Omaha called no economist to dispute Dr. Brown. Omaha chose to "roll the dice."

## PUNITIVE DAMAGES

[¶31] Although Omaha generally couches its argument for a reduction of punitive damages in terms of a "remittitur," it may not be using the correct nomenclature. "The decision to order remittitur is circumscribed by the Seventh Amendment." Thorne v. Welk Inv., Inc., 197 F.3d 1205, 1212 (8th Cir. 1999) (citing Bonura v. Sea Land Serv., Inc., 505 F.2d 665, 669 (5th Cir. 1974)). Generally, when the district court intends to remit the damage award, the proper procedure is to condition the denial of defendant's new trial motion on plaintiff's consent to a remittitur. Id. (citing Yost v. Sauter, 420 F.2d 79, 81 n. 2 (D.C. Cir. 1969)). In Thorne, the Court of Appeals held that the district court erred when it remitted an excessive verdict without first obtaining the plaintiff's consent or offering the plaintiff the option of proceeding to a new trial. Id.

[¶32] In other words, a remittitur generally cannot be granted unconditionally. However, there is a distinction to be drawn between what is traditionally referred to as "remittitur" and a reduction of an excessive punitive damages award:

> "A constitutionally reduced verdict . . . is really not a remittitur at all. A remittitur is a substitution of the court's judgment for that of the jury regarding the appropriate award of damages. The court orders a remittitur when it believes the jury's award is *unreasonable* on the facts. A constitutional reduction, on the other hand, is a determination that the law does not permit the award. Unlike a remittitur, which is discretionary with the court . . . a court has a mandatory duty to correct an unconstitutionally excessive verdict so that it conforms to the requirements of the due process clause." [*Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1331-32 (11th Cir. 1999)]. While the traditional remedy of remittitur does require the plaintiff's consent in order to comport with the Seventh Amendment right to jury trial, *Thorne*, 197 F.3d at 1212, the court's mandatory review of a punitive damages award does not implicate the Seventh Amendment. The plaintiff's consent to a constitutional reduction of a punitive damages award is "irrelevant" because the court must decide this issue as a matter of law. *Johansen*, 170 F.3d at 1331.

Ross v. Kansas City Power & Light Co., 293 F.3d 104, 1049-50 (8th Cir. 2002) (quoting Johansen, 170 F.3d at 1331-32).

[¶33] The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor. State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003). To that end, the initial task before the Court is deciding whether the $7,500,000 punitive damages award which remains comports with the requirements of due process. In reviewing a case decided by United States District Judge Lawrence Piersol, the Court of Appeals for the Eighth Circuit set forth the framework for considering whether punitive damages are constitutionally excessive:

> The Supreme Court has set forth three "guideposts" to consider in determining whether a particular punitive damage award is excessive in a constitutional sense. Those guideposts are: the reprehensibility of the misconduct; the disparity between the plaintiff's actual or potential harm and the punitive damage award; and the difference between the amount of punitive damages and the civil (or criminal) penalties authorized or imposed in comparable cases. Campbell, 538 U.S. at 418, 123 S.Ct. 1513 (citing BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)). "The dominant consideration for assessing the constitutionality of a punitive damages award is the reprehensibility of the defendant's conduct." Williams v. ConAgra Poultry Co., 378 F.3d 790, 796 (8th Cir.2004) (citing Gore, 517 U.S. at 575, 116 S.Ct. 1589).
>
> With respect to the first guidepost, reprehensibility, the courts are to consider five factors: (1) whether the harm caused was physical as opposed to economic; (2) whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the conduct involved repeated actions or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident. Campbell, 538 U.S. at 419, 123 S.Ct. 1513.
> * * *
> The second "guidepost" requires us to compare the ratio between the punitive and compensatory damages.
> * * *
> The final "guidepost" requires us to compare the punitive damage award with the civil or criminal penalties that could be imposed.

Diesel Machinery, Inc. v. B.R. Lee Industries, Inc., 418 F.3d 820, 839-40 (8th Cir. 2005).

[¶34] "'[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct.'" Campbell, 538 U.S. at 419 (quoting Gore, 517 U.S. at 575). In examining Omaha's conduct, it is quickly apparent that the punishment effected by the jury's verdict is highly exaggerated when weighed against the acts of Omaha.

[¶35] Taking into account the evidence at trial, and looking at it in a light to support what the jury did, it is clear that Omaha was not forthright with Kent throughout the parties' interaction in 1990 and 1991. Kent was inexperienced in the health insurance industry and relied upon Omaha to provide him with appropriate advice on how to proceed with the group health plans. The deceitful conduct of Omaha spanned over several months, but basically involved Omaha's failure to keep Kent apprized of one very important detail of which it was aware, namely, that Kent was operating an illegal plan under South Dakota law. Even after having learned of the legal problems, Omaha opted to continue the illegal plan through the end of 1991 while Kent unwittingly believed that a change had been effected and that he was operating a legal MPP. While this certainly qualifies as misconduct on Omaha's part and obviously gave rise to liability with respect to Kent's loss of insurance license and future income, it does not merit such an exorbitant punishment. The harm sustained by Kent for which Omaha could be held liable was purely economic and involved no direct threat to Kent's health or safety. Nothing about Omaha's actions can be viewed as a "reckless disregard of the health or safety of others." Omaha's conduct did not involve active trickery or animosity toward Kent. Rather, it involved silence where there should have been disclosure. It was driven by greed and covering Omaha's own "behind." Moreover, it could be argued, and has been argued *ad nauseam* by Omaha, that a great deal of Kent's undoing was self-inflicted, as there were other reasons behind his license revocation other than operating an illegal plan. Specifically, the evidence at trial revealed that he was not candid with ICB about the self insured plan. In fact, he was misleading his client to whom he owed a duty of loyalty. Mr. Kent did not present a model of virtue. He was acting in his own best interests, contrary to that of his client.

[¶36] The ratio of punitive damages to compensatory damages is approximately 3:1 in this case. The Supreme Court has not set rigid benchmarks that a punitive damages award may not surpass. It is simply not possible to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." Gore, 517 U.S. at 576. "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limits of the due process guarantee." Campbell,

538 U.S. at 425. "The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct." Id.

[¶37] Because each punitive damages award is so fact dependent, there is little by way of a consistent pattern in what is or is not excessive. In some Eighth Circuit cases, very high punitive to compensatory damage ratios have been upheld, especially where compensatory damages are somewhat lower. See e.g. Grabinski v. Blue Ford Sales, Inc., 203 F.3d 1024 (8th Cir. 2000) (27-to-1 ratio upheld where defendants sold plaintiff a 1984 GMC Jimmy that had been damaged in a collision, saying that it was in "A-1" condition and had never been in a wreck), United States v. Big D. Enterprises, 184 F.3d 924, 933 (8th Cir. 1999) (100-to-1 ratio upheld in case against an owner of an apartment complex who had an established pattern of rejecting rental applications based on race), and Dean v. Olibus, 129 F.3d 1001 (8th Cir. 1997) (14-to-1 ratio upheld where bail bondsman initiated proceedings against plaintiff, knowing that he was not the person who had obtained bond). If there is one defining characteristic among these cases, it is that they involved circumstances with relatively low compensatory damages.

[¶38] In other Eighth Circuit cases, where significant amounts of compensatory damages have been awarded, the Court of Appeals has determined that a reduction to an equal ratio with the compensatory damages award is appropriate. See e.g. Williams v. ConAgra Poultry Co., 378 F.3d 790, 799 (8th Cir. 2004) (punitive damages award in the amount of $6,063,750 was excessive, in violation of due process, and was therefore required to be reduced to $600,000, an amount equal to the compensatory damages awarded); Boerner v. Brown & Williamson Tobacco Co., 394 F.3d 594 (8th Cir. 2005) (where $4,025,000 in compensatory damages was awarded, punitive damage award of $15,000,000 was found to be excessive and reduced to $5,000,000 in order to comport with the requirements of due process). To be sure, the compensatory damages awarded to Kent represent no small sum. It is an understatement to say that $2,400,000 is a great deal of money in this case.

[¶39] Finally, the civil and criminal penalties that can be imposed bear mentioning. The Court is not aware of any comparable civil penalties for deceit or breach of fiduciary duty. "Criminal fines are particularly informative because punitive damages are quasi-criminal." In re Exxon Valdez, 270 F.3d 1215, 1245 (9th Cir. 2001). Nonetheless, in the overall scheme of the Court's

analysis of punitive damages, the possible criminal penalties are the least helpful to the Court, especially under the unique facts of this case. See e.g. Campbell, 538 U.S. 428 ("When used to determine the dollar amount of the award, however, the criminal penalty has less utility.")  18 U.S.C. § 3571(c) is the federal measure for fines and generally provides for up to a $500,000 fine for a felony or up to a $200,000 fine for a Class A misdemeanor.  However, pursuant to 18 U.S.C. § 3571(d), "if the offense results in pecuniary loss to a person other than the defendant, the defendant may be fined not more than . . . twice the gross loss."  The punitive damages awarded to Kent in this case easily exceed the possible criminal penalties for a violation of federal law.  Even if "twice the gross loss" were read to mean twice the amount of economic loss awarded by the jury, $7,500,000 is still considerably more than any permissible criminal penalty.

[¶40]  Taking into account all of the State Farm factors, it is clear that the punitive damages awarded by the jury exceed the permissible bounds of due process and a reduction is warranted. Based upon the circumstances of this case, the Court concludes that $2,400,000 is the maximum punitive damages award that it should uphold.

[¶41]  Now, therefore,

[¶42]  IT IS ORDERED:

(1)  Omaha's motion for judgment as a matter of law (Doc. 129) is granted in part, and denied in part, to the extent that Kent's shipping document claims are dismissed and damage items 1, 4, and 5 of the jury's verdict are vacated.

(2)  Omaha's motion for remittitur (Doc. 129) is denied.

(3)  Omaha's motion for new trial (Doc. 129) is denied.

(4)  The punitive damages award as found by the jury violates the Due Process Clause and is unconstitutionally excessive.  The punitive damages award is accordingly reduced to $2,400,000.

[¶43]  Dated this 28th day of April, 2006.

BY THE COURT:

_____
CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
           DEPUTY